**No. 2014-1335**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

APPLE INC., a California corporation,

*Plaintiff-Appellee*,

*v.*

SAMSUNG ELECTRONICS CO., LTD., a Korean Corporation,
SAMSUNG ELECTRONICS AMERICA, INC., a New York Corporation,
SAMSUNG TELECOMMUNICATIONS AMERICA LLC,
a Delaware Limited Liability Company,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of California in No. 5:11-cv-1846-LHK,
United States District Judge Lucy H. Koh.

### *AMICUS CURIAE* BRIEF OF CROCS, INC. IN SUPPORT OF
### PLAINTIFF-APPELLEE APPLE INC.
### AND IN SUPPORT OF AFFIRMANCE

AUGUST 4, 2014

Natalie Hanlon-Leh
Joel D. Sayres
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203
(303) 607-3500

*Counsel for Crocs, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Crocs, Inc. certifies the following:

**1.     The full name of every party or *amicus* represented by us is:**

Crocs, Inc.

**2.     The name of the real party in interest represented by us is:**

Not applicable.

**3.     All parent corporations and any publicly held corporation that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

None.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

<u>FAEGRE BAKER DANIELS LLP</u>:  Natalie Hanlon-Leh; Joel D. Sayres

Dated:  August 4, 2014          */s/ Natalie Hanlon-Leh*
                                Natalie Hanlon-Leh
                                Joel D. Sayres
                                FAEGRE BAKER DANIELS LLP
                                3200 Wells Fargo Center
                                1700 Lincoln Street
                                Denver, CO 80203
                                (303) 607-3500

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .......................................................................i

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT OF INTEREST OF *AMICUS CURIAE*..........................................1

INTRODUCTION ....................................................................................2

BACKGROUND ......................................................................................4

    I.    The Importance and Evolution of Design Rights...............................4

    II.   Design Rights Have Played A Significant Role In The Early
History Of Crocs ..................................................................6

        A.    Early ITC and District Court Actions; General Exclusion
Order .......................................................................6

        B.    Recognition of the Iconic Nature of the Early Crocs
Design ......................................................................7

    III.  Crocs Relies Upon Design Protection to Drive its Innovation .............8

ARGUMENT .........................................................................................10

    I.    Section 289 Provides for Recovery of a Design Patent Infringer's
Profits without Apportionment............................................10

    II.   Section 289 Furthers the Goals of Promoting Innovative Design
and Protecting Companies From Infringement of Their Most
Valuable Assets .................................................................12

        A.    Design Patents are Critical to Promoting Innovation and to
Protecting the Many Companies that Rely on Product
Appearance and Design ...............................................12

B.      Section 289 Addresses Both the Problems of
        Apportionment and the Need for Deterrence against
        Copying in the Digital Age ........................................................14

III.    Changing the Legal Framework of Section 289 Would
        Undermine the Design Patent System.................................................17

A.      Requiring Apportionment Would Impose Uncertainty and
        Costs on Patent Holders While Removing a Critical
        Deterrent against Infringers ......................................................17

B.      Limiting the "Article of Manufacture" to Only the Specific
        Elements in a Patented Design Would Make it Practically
        Impossible for Plaintiffs to Recover Infringers' Total
        Profits ........................................................................................19

CONCLUSION .......................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294 (Fed. Cir. 2010)........................6

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)....................21

*Gorham Co. v. White*, 81 U.S. 511 (1871)...............................................................13

*In re Certain Foam Footwear*, U.S. Int'l Trade Comm'n, No. 337-TA-567
  (July 15, 2011) ......................................................................................................7

*John Mezzalingua Assoc's, Inc. v. ITC*, 660 F.3d 1322 (Fed. Cir. 2011)...............16

*Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437 (Fed. Cir. 1998) ................10, 18

*Peter Pan Fabrics, Inc. v. Acadia Co.*, 173 F. Supp. 292 (S.D.N.Y. 1959)............15

*Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166 (6th Cir. 1980)...............11

*Transmatic, Inc. v. Gulton Indus., Inc.*, 601 F.2d 904 (6th Cir. 1979)....................13

*Untermeyer v. Freund*, 58 F. 205 (2d Cir. 1893).....................................................11

## STATUTES

35 U.S.C. § 289............................. 1, 2, 3, 4, 9, 10, 11, 12, 14, 16, 17, 19, 20, 21, 22

Act of Aug. 1, 1946, 60 Stat. 778 ............................................................................12

Act of Feb. 18, 1922, 42 Stat. 392 ...........................................................................12

Act of July 19, 1952, 66 Stat. 792............................................................................12

Design Patent Act of 1887 ..................................................................................10, 18

## OTHER AUTHORITIES

*2008 Will Be A Year To Remember for Design Patents* ...........................................14

*A Bill To Provide Protection for Fashion Design: Hearing on H.R. 5055 Before the Subcomm. on Courts, the Internet, and Intellectual Prop.*, 109th Cong. 9, 11-12 (2006)................................................................16

David R. Gerk, *Five Reasons Why 2008 Will Be A Year To Remember for Design Patents*, Intell. Prop. Today at 39 (April 2008)................................14

Debora Borchardt, "The Bestselling and Most-Wished-For-Shoes,".........................7

Design Museum, *Fifty Shoes That Changed the World* 86-87 (2009) ......................7

Elizabeth Ferrill & Tina Tanhehco, *Protecting the Material World: The Role of Design Patents in the Fashion Industry*, 12 N.C. J.L. & Tech. 251, 277-78 (2011) ...............................................................14, 15, 16, 17

H.R. Rep. No. 49-1966 (1886), *reprinted in* 18 Cong. Rec. 834 (1887).....10, 13, 16

http://www.thestreet.com/story/12751848/3/the-bestselling-and-most-wished-for-shoes.html (June 21, 2014) .........................................................7

Katelyn Brandes, *Design Protection in the United States and European Union: Piracy's Detrimental Effects in the Digital World*, 37 Brooklyn J. Int'l L. 1115 (2012) ..................................................................... 17-18

Mark A. Lemley, *A Rational System of Design Patent Remedies*...........................11

*Nama-Stay: Lululemon Is Defending its Turf Through Design Patents*, 99 A.B.A.J. 9 (January 2013) ...........................................................................17

Scott D. Locke, *Fifth Avenue and the Patent Lawyer: Strategies for Using Design Patents to Increase the Value of Fashion and Luxury Goods Companies*, 5 J. Marshall Rev. Intell. Prop. L. 40, 53 (2005) ...........................13

Susanna Monseau, *European Design Rights: A Model for the Protection of All Designers from Piracy*, 48 Am. Bus. L.J. 27, 42-44 (2011)........................18

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Crocs, Inc. ("Crocs") is a publicly-traded company based in

Niwot, Colorado. A world leader in innovative casual footwear, Crocs celebrated

its tenth anniversary in 2012. Crocs has sold more than 200 million pairs of shoes

in more than 90 countries around the world, and its annual sales now exceed $1

billion. Crocs employs over 2,700 workers in this country alone, and is at the

forefront of research and development of new technologies related to foam molded

footwear and footwear in general.

Crocs respectfully submits this brief to explain why Defendants-Appellants

Samsung, *et al.*'s ("Appellants") position regarding remedies for design patent

infringement under 35 U.S.C. § 289 is incorrect, and to describe the severe

negative consequences Appellants' position would have for numerous industries

that rely on innovative designs and the corresponding protections afforded by

Section 289. In particular, Crocs wishes to bring to the Court's attention the

importance of allowing recovery of a design patent infringer's total profit—

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal
Rule of Appellate Procedure 29(c)(5), Crocs states the following: (1) no party's
counsel authored the brief in whole or in part; (2) no party or a party's counsel
contributed money that was intended to fund preparing or submitting the brief; and
(3) no person other than the amicus curiae, its members, or its counsel contributed
money that was intended to fund preparing or submitting the brief.

without apportionment—to industries and companies outside of the smartphone and electronics context from which the present case arises.

Indeed, there are myriad substantial and traditional industries, like the multi-billion dollar footwear industry in which Crocs operates, that depend on Section 289's strong remedy and deterrent effect—protections that were put in place by Congress for policy reasons that remain at least as applicable, if not more so, today as they did over 120 years ago. Requiring a showing of apportionment would not only violate the text, Congressional intent, and precedent applying Section 289, but would undermine the very protections that Congress sought to implement and maintain through numerous revisions to the patent laws, protections that continue to encourage innovation in design and drive sales across industries. Such a sea change would severely harm Crocs' ability to create, protect, and enforce patents for its innovative designs. Crocs thus respectfully submits this brief to urge affirmance on this issue.

## INTRODUCTION

The text, legislative history, and judicial application of 35 U.S.C. § 289 are clear—an infringer of a design patent is liable to the patent owner for the infringer's total profit. There are many sound reasons for this, including the importance of design patent rights in furthering the decorative arts, the nature of design as the driver of a product's sales, and the long-recognized and insoluble

problems of apportionment.  Congress recognized these considerations over a

century ago, and has not changed this basic framework through multiple

amendments to patent remedy statutes.  Any change to Section 289, if it were to

come, must come from Congress.

Such a change, however, is not needed and not warranted.  Section 289

continues to further the original policy goals that protect designers' innovations

and further the decorative arts, whether applied to simple carpets or advanced

smartphones.  Indeed, while much of the current briefing of the parties and *amici*

understandably focus on the smartphone industry that forms the context of the facts

of this case, Crocs submits this brief to make clear that Section 289 plays a critical

role in long-standing and traditional industries outside of the electronics and

technology sectors, and that any change to availability of an infringer's total profits

would have drastic consequences for these industries.

Simply put, for companies in industries such as footwear, apparel,

accessories, and appliances (to name a few), design can be everything— the

differentiator in the market, the driver of sales, and the lifeblood of the company.

These companies invest substantially in design, and in doing so provide the public

with new and unique innovations, as exemplified by such designs as the Crocs'

Classic Clog.  At the same time, these companies rely on the enforcement

framework currently provided by the design patent system, including Section 289,

to protect these innovations. Without the prospect of recovering infringer's profits, these companies would face greater uncertainty in protecting their investments, greater threats from copyists and professional knock-off companies, and additional costs and burdens of apportionment that Congress sought to avoid over 120 years ago. On the other side of the coin, infringers would no longer face the deterrent that Section 289 provides, and could copy with near impunity, knowing that they would only at worst have to surrender a portion of their profits.

In sum, adopting Appellants' interpretation of Section 289 would make design patents more costly and complicated to obtain and enforce, and would hinder design and innovation for companies like Crocs. Crocs thus respectfully submits this brief to illustrate this reality, particularly for numerous industries outside of smartphones and electronics.

## BACKGROUND

## I.     THE IMPORTANCE AND EVOLUTION OF DESIGN RIGHTS

Long before the era of smartphones, United States patent law has recognized the importance of protecting from infringement ornamentation applied to articles of manufacture. From the eating utensil handle design of *Gorham v. White*, to the saddle design of *Whitman Saddle*, to the nail buffer design of *Egyptian Goddess*, Congress and the courts have refined design patent law to promote continued innovation in light of continued technological advancement. Laws designed to

protect advances in ornamentation applied to cast metal or molded glass were evolved to extend protection to ornamentation applied to molded plastics and polymers, and eventually to today's manufactured products which often involve complex injection molding, blow molding, and even three-dimensional printing.

As manufacturing technology evolves, companies can make articles with creative shapes and surface patterns never thought possible. Unfortunately, the more expense and time involved in creating a new design that consumers find attractive, the more tempting it is for others to copy it. And the same technology that made the innovative design possible also makes it easier to copy, for example by scanning and reverse molding.

For example, some companies have become so adept at copying genuine U.S. patented articles that experts and/or complex authentication features are becoming necessary to distinguish the genuine article from the copycat article. Companies in the business of copying in this manner often arrange for the copies to be manufactured as cheaply as possible outside of the United States. They then import them at a price that vastly undercuts the price of the articles to which the innovative design is genuinely applied, primarily because the patentee has already done the difficult and expensive work of creating and promoting the innovative design of the article.

## II.   DESIGN RIGHTS HAVE PLAYED A SIGNIFICANT ROLE IN THE EARLY HISTORY OF CROCS

From the time of its founding in late 2002 and continuing through the widespread international availability of its Classic Clog product by 2005, Crocs recognized that design patents would be an important part of protecting its innovative designs and intellectual property.  As soon as Crocs' products became popular, companies rushed in to copy their distinctive designs in the U.S. and abroad.  Crocs relied on its intellectual property protection, including its design patents, to stem the tide of knockoff footwear.

### A.   Early ITC and District Court Actions; General Exclusion Order

Within a week after its first U.S. design patents issued in 2006, Crocs filed parallel design and utility patent infringement actions before the U.S. International Trade Commission ("ITC") and United States District Court for the District of Colorado against eleven of the most prolific U.S. infringers.  Several defendants settled early and ceased their infringement, and the district court action was stayed pending the outcome of the ITC investigation.  After protracted litigation, this Court concluded on February 24, 2010 that Crocs' design patent was infringed by all remaining defendants in the investigation.  *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1306  (Fed. Cir. 2010).  On remand, the ITC issued a Final Commission Determination of Violation and General Exclusion Order in favor of

- 6 -

Crocs. *In re Certain Foam Footwear*, U.S. Int'l Trade Comm'n, No. 337-TA-567 (July 15, 2011). Without this strong U.S. design patent protection, it is entirely plausible that infringers would be openly selling direct Crocs knockoff products in drug stores or flea markets today, at a substantial loss to Crocs.

### B. Recognition of the Iconic Nature of the Early Crocs Design

The same design that was found infringed by the defendants in the *Crocs v. ITC* case has been recognized throughout the world as being one of the most iconic and recognizable footwear designs in history. In 2008, Footwear News named this design as one of the top "Icons in the Making." Footwear News, vol. 64, no. 18 (May 12, 2008), at 15. In 2009, that design was described in *Fifty Shoes That Changed the World*, a book listing the 50 shoes that made the most substantial impact in the world of British design in the preceding 150 years. Design Museum, *Fifty Shoes That Changed the World* 86-87 (2009). The Crocs Classic Clog continues to be ranked among the "Bestselling and Most-Wished-For Shoes" (third on the list), has been part of the Amazon Best Seller's list for men's shoes for over 2000 days. Borchardt, Debora, "The Bestselling and Most-Wished-For-Shoes," TheStreet, *available at* http://www.thestreet.com/story/12751848/3/the-bestselling-and-most-wished-for-shoes.html (June 21, 2014). As such, without intellectual property protection, including effective U.S. design patent protection, others would likely not be deterred from copying this famous design with impunity.



**Crocs Classic Clog**

### III.    CROCS RELIES UPON DESIGN PROTECTION TO DRIVE ITS INNOVATION

In the case of the Crocs iconic footwear, the design of the footwear is almost one and the same with its brand—consumers see a molded clog embodying the patented Crocs design and immediately recognize it as (a) having aesthetic value and (b) originating from Crocs.  In order to consistently ensure that its products are attractive to the consumer, Crocs employs or contracts with at least 150 industrial designers and other research and development personnel worldwide.  These are trained artisans who specialize in the aesthetic—how to vary the shape or the appearance or the surface treatment of an article of manufacture to make it more visually appealing.  This is in addition to the people who specialize in molding or manufacturing the product, as well as the people who specialize in how to market or sell the product.

The contribution of the industrial designer to a final product is uniquely protected by design patents; without effective design patent protection, consumers, who are focused on price savings, often cannot differentiate between products sold by the legitimate innovators and those which are mere copies of the innovators' designs. Removing the ability of legitimate design innovators to recover the infringer's profits would deter future innovation, contrary to the intent of Congress in enacting Section 289.

Crocs now owns over 100 active U.S. design patents and design patent applications, as well as over 500 international industrial design applications or registrations. In 2012, Crocs was named the National Retail Federation's Retail Innovator Brand of the Year. In 2013, Crocs won the Consumer Goods Technology Most Innovative Company Award.

While in its early years Crocs released about five new styles per season,[2] Crocs now releases several hundred new styles each season. The *primary* differentiator between these styles is not the function of the article or the method of manufacture, but is instead the ornamental or aesthetic design of the article. When an infringer chooses to copy a Crocs product, it is clear exactly which style or design (from among hundreds) the infringer intended to copy. For this reason,

---

[2] The two footwear "seasons" per year typically include at least (1) a spring/summer season and (2) a fall/winter or fall/holiday season.

Crocs invests in its design innovation by securing design patents, so that it is able to recover the ill-gotten profits of infringers who apply a Crocs-patented design or a substantially similar equivalent thereof to their own product.

## ARGUMENT

## I. SECTION 289 PROVIDES FOR RECOVERY OF A DESIGN PATENT INFRINGER'S PROFITS WITHOUT APPORTIONMENT

Section 289 unambiguously provides for recovery of a design patent infringer's total profit, without apportionment. This has been ably explained by Appellee (Apple Brief at 45-53), and Crocs will not repeat those arguments here. Briefly stated, such a construction of Section 289 is supported by the following:

- The statute's plain text. *See* 35 U.S.C. § 289 (infringer "shall be liable to the owner to the extent of his *total profit*") (emphasis added).

- The statute's legislative history. *See Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1441-42 (Fed. Cir. 1998) (explaining legislative history of Section 289, including Congress's "removal of the need to apportion the infringer's profits between the patented design and the article bearing the design" in Design Patent Act of 1887, as a direct response to the *Dobson* cases); H.R. Rep. No. 49-1966 (1886), *reprinted in* 18 Cong. Rec. 834, at 834 (1887) ("[I]t is expedient that the infringer's entire profit on the article should be recoverable . . . for it is not apportionable.").

- Subsequent cases interpreting the statute. *See, e.g.*, *Untermeyer v. Freund*, 58 F. 205, 212 (2d Cir. 1893) ("The rule which congress declared for the computation of profits was the total profit from the manufacture or sale of the article to which the design was applied, as distinguished from the pre-existing rule of the profit which could be proved to be attributable to the design."); *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166, 1171 (6th Cir. 1980) (Section 289 "provides a single measure of relief applicable to all cases of design patent infringement," "assures that the profit to the wrongdoer is fully extracted," and "place[s] the patentee in the shoes of the infringer").

- Academics and other authorities. *See, e.g.*, Mark A. Lemley, *A Rational System of Design Patent Remedies*, 17 Stan. Tech. L. Rev. 219, 223 (2013) ("By its terms, [Section 289] provides that design patent cases can no longer apportion damages. If you include the patented design, you must pay your entire profit to the plaintiff.").

Appellants and their supporting *amici* make various policy-based arguments about why the law should be different. As Crocs explains below, policy considerations actually support the current mandated interpretation of Section 289 barring apportionment. But in any event, any change to the scope of Section 289

must come from Congress, and not from this esteemed Court.[3]  The district court

correctly decided this point below.

## II.  SECTION 289 FURTHERS THE GOALS OF PROMOTING INNOVATIVE DESIGN AND PROTECTING COMPANIES FROM INFRINGEMENT OF THEIR MOST VALUABLE ASSETS

### A.  Design Patents are Critical to Promoting Innovation and to Protecting the Many Companies that Rely on Product Appearance and Design

Design patents are critical both to furthering the Constitution's delegation to

Congress of promoting the useful arts and to protecting the innovative companies

and industries that rely on appearance and design to differentiate their products.

As the Supreme Court stated over 140 years ago,

> The acts of Congress which authorize the grant of patents for designs
> were plainly intended to give encouragement to the decorative arts . . .
> The law manifestly contemplates that giving certain new and original
> appearances to a manufactured article may enhance its salable value,
> may enlarge the demand for it, and may be a meritorious service to the
> public.  It therefore proposes to secure for a limited time to the

---

[3] Congress certainly knows how to amend the patent laws related to remedies in response to changing circumstances such as the evolution of technology, or in response to concerns of equity or incentives in the patent system, to which Appellants and their supporting *amici* allude.  Indeed, since the Act of 1887, Congress has amended the patent laws several times with respect to remedies.  *See* Act of Feb. 18, 1922, 42 Stat. 392; Act of Aug. 1, 1946, 60 Stat. 778; Act of July 19, 1952, 66 Stat. 792.  Yet Congress has not changed the availability of an infringer's total profits as a remedy for design patent infringement, indicating that Congress believes that the original rationales underlying this framework are still applicable.

ingenious producer of those appearances the advantages flowing from them.

*Gorham Co. v. White*, 81 U.S. 511, 524-25 (1871).

The reasons for protecting innovative designs are clear—in many industries and for many products, it is *appearance and design* that matter, that drive sales, and that provide value to consumers and the public. *See id.* at 525 ("It is the appearance itself which attracts attention and calls out favor or dislike. It is the appearance itself, therefore, no matter by what agency caused, that constitutes mainly, if not entirely, the contribution to the public which the law deems worthy of recompense."); *Transmatic, Inc. v. Gulton Indus., Inc.*, 601 F.2d 904, 911 (6th Cir. 1979) ("The critical essence of the subject of a design patent is its distinctive appearance. It is 'the effect upon the eye' which controls." (citation omitted)); H.R. Rep. No. 49-1966, 18 Cong. Rec. at 834 ("[I]t is just that the entire profit on the article should be recoverable and by the patentee, for it is the design that sells the article, and so that makes it possible to realize any profit at all . . . .").

Accordingly, "[a]lthough there is temptation to treat design patents as soft or minor patents, in many industries design patents can be used to protect a client's most valuable intellectual property." Scott D. Locke, *Fifth Avenue and the Patent Lawyer: Strategies for Using Design Patents to Increase the Value of Fashion and Luxury Goods Companies*, 5 J. Marshall Rev. Intell. Prop. L. 40, 53 (2005). This

- 13 -

is especially true for the many industries that rely on appearance and design, such as the footwear and accessory industries. *See* Elizabeth Ferrill & Tina Tanhehco, *Protecting the Material World: The Role of Design Patents in the Fashion Industry*, 12 N.C. J.L. & Tech. 251, 277-78 (2011) ("While some academics may discount their value, design patents have been used to provide protection for products of the fashion industry, including shoes, handbags, belts, elements of outerwear, headgear, and eyeglass frames."); David R. Gerk, *Five Reasons Why 2008 Will Be A Year To Remember for Design Patents*, Intell. Prop. Today at 39 (April 2008) (noting the interest in design patent law by "an array of corporations known to be leaders in the electronics, footwear, apparel, appliance and various other industries that rely on design patents to protect their innovations from 'copycats' and 'knock-off artists'"). Indeed, as described in Part B of the Background, *supra*, this is especially true for Crocs, whose iconic shoe designs have differentiated it from competitors, driven sales, and given Crocs a unique and important place in footwear design history. In short, for Crocs and many other companies, design patent protection is a core asset.

## B. Section 289 Addresses Both the Problems of Apportionment and the Need for Deterrence against Copying in the Digital Age

Unfortunately, a hallmark of the fashion and footwear industries is the omnipresence of infringers—companies whose business model is to copy or

"knock off" designs that innovators spend months or years developing.  *See Peter Pan Fabrics, Inc. v. Acadia Co.*, 173 F. Supp. 292, 296 (S.D.N.Y. 1959) ("The well-known history of the struggle between 'copyists,' 'pirates,' 'freebooters,' and the design 'originators' in the textile and allied industries has been described extensively.").  The ramifications of "knockoffs" to these industries are enormous, resulting in billions in lost sales, as well as erosion of secondary public benefits such as tax revenues and wages.  *See, e.g.*, Ferrill & Tanhehco, *Protecting the Material World*, at 258-61.  Indeed, some experts argue that knockoffs represent an even greater threat to the fashion world than counterfeit goods, "partly because knockoffs have become so widespread, and partly because they have the ability to harm designers in a real way – economically and creatively, by taking away the incentive to create original design."  *Id.* at 256.

While Appellants and their supporting *amici* argue that recent technological advances undermine the original rationale for awarding infringer's profits without apportionment, such advances actually further support the policy considerations for doing so.  "Technology has only accelerated the ability of knockoff designers to view designs and reproduce them.  Today, high-end designs from runway shows become available on the Internet as a matter of practice within twenty-four hours . . . .  In the digital age, designers not only face the threat of knockoffs, but need to confront the possibility that the knockoffs are likely to hit the market well

before their original work." *Id.* at 265-268.  As a representative from Council of

Fashion Designers of America testified before a House subcommittee in 2006,

"Copying, years ago, would take anywhere from three to four months to a year or

more.  But as I said, all that changed with new technology. . . .  Today, there are

even software programs that develop patterns from 360 degree photographs taken

at the runway shows.  From those patterns, automated machines cut and then stitch

perfect copies of a designer's work." *A Bill To Provide Protection for Fashion

Design: Hearing on H.R. 5055 Before the Subcomm. on Courts, the Internet, and

Intellectual Prop.*, 109th Cong. 9, 11-12 (2006).

The growth and ease of design infringement over recent years counsels in

favor of the strong deterrence provided by Section 289.  "Design patents protect

fundamentally different subject matter than that which is encompassed by a utility

patent, and can be used to effectively and efficiently combat knock-off products

that can be easily identified by visual inspection alone." *John Mezzalingua

Assoc's, Inc. v. ITC*, 660 F.3d 1322, 1335 (Fed. Cir. 2011) (Reyna, J., dissenting);

*see also* H.R. Rep. No. 49-1966, 18 Cong. Rec. at 834 ("[Design patent laws

create] a tendency to encourage the purchase of articles of standard qualities as

opposed to shoddy imitations, which is a true economy in individuals and so in

masses.").  Faced with the prospect of losing *all* of its profits from the sale of an

infringing product, a would-be infringer must think twice before copying.  *See,*

*e.g.*, Ferrill & Tanhehco, *Protecting the Material World*, at 293 ("[A] consistent policy of design patenting may be a valuable deterrent against knockoff designers, even without having to actually file a lawsuit."); *Nama-Stay: Lululemon Is Defending its Turf Through Design Patents*, 99 A.B.A.J. 9, at 10 (January 2013) (noting practitioner's opinion that design patents are "mostly used as a deterrent"). In short, for companies whose most valuable assets include their industrial designs, the remedy of Section 289 is critical to addressing both the problems of apportionment and the need for strong deterrence.

## III. CHANGING THE LEGAL FRAMEWORK OF SECTION 289 WOULD UNDERMINE THE DESIGN PATENT SYSTEM

### A. Requiring Apportionment Would Impose Uncertainty and Costs on Patent Holders While Removing a Critical Deterrent against Infringers

Changing Congress's clear proscription against apportioning design patent infringers' profits would undermine the design patent system by making design patents less valuable and removing a critical deterrent against would-be copyists.

First, obtaining effective design patent coverage is already a challenge for many companies, such that several commentators have questioned the current system's ability to protect designs such as those in the fashion industry. *See, e.g.*, Katelyn Brandes, *Design Protection in the United States and European Union: Piracy's Detrimental Effects in the Digital World*, 37 Brooklyn J. Int'l L. 1115,

1128 (2012) (describing design patent requirements that can be "insurmountable obstacles" for designers, and noting that the "lengthy waiting period, coupled with the expense of preparing an application, discourages many designers from seeking patent protection"); Susanna Monseau, *European Design Rights: A Model for the Protection of All Designers from Piracy*, 48 Am. Bus. L.J. 27, 42-44 (2011) (noting shortcomings of design patent system, including that "as a practical matter, the design patent process is both lengthy and costly"). If companies must also face uncertainty as to whether they can receive adequate damages from enforcing their design patents, it may discourage companies from seeking such protection in the first place, and thus discourage investment in such arts overall. For companies such as Crocs for whom innovative designs are critical, such uncertainty would severely hamper innovation, investment, and profitability.

Second, changing the current system would usher back in the same problems of apportionment that Congress sought to remedy with the Design Patent Act of 1887. "Apportionment presented particularly difficult problems of proof for design patentees, for the patentee was required to show what portion of the infringer's profit, or of his own lost profit, was due to the design and what portion was due to the article itself." *Nike*, 138 F.3d at 1441. Requiring determinations of apportionment would saddle patent owners with additional costs and delay, and likely would require the engagement of experts and other resources to determine

- 18 -

causation and calculate damages. Again, such a change would further dissuade companies from protecting or enforcing their design inventions, ultimately dampening the rate of design innovation.

Finally, changing the scope of Section 289 would eliminate the critical deterrent effect of awarding infringer's profits without apportionment. As described above, the "knockoff" industry is extremely lucrative. A system in which an infringer only faces a reasonable royalty, a portion of the patent owner's lost profits, or a portion of the infringer's total profits would not provide much of a deterrent, because an infringer could still profit from the infringement and downplay any partial damages award as a cost of doing business. A more robust system is needed, especially in industries such as footwear and molded products, where patented designs can be the lifeblood of a company. *See supra* Background, Part B.

**B.      Limiting the "Article of Manufacture" to Only the Specific Elements in a Patented Design Would Make it Practically Impossible for Plaintiffs to Recover Infringers' Total Profits**

In addition to its argument for direct apportionment, Appellants propose apportionment in disguise—defining the accused "article of manufacture" to include only the specific portion of an accused product that embodies the patented design, and disallowing the recovery of any profits not "attributable" to that particular "article." (Appellants Br. at 38–39.) In order to avoid such a limitation,

- 19 -

Appellants' interpretation of Section 289 would require a patentee to claim the design of each and every feature or visual aspect of a final product, either in a single design application or in multiple design applications for the same article. In practice, this would make it all but impossible for a patentee to recover an infringer's total profits from the sale of an accused product.

Under the interpretations of Section 289 advanced by the Appellants and their *amici*, the infringer would challenge an award of total profits by arguing that the "article of manufacture" in the claimed design is some intermediate component, distinct from the final product as sold in the marketplace. Under this logic, because the latter features are not part of the specific "article of manufacture" for the patented design, their value must be apportioned out of any award to the patentee for infringement.

A patentee could only avoid such an outcome by claiming each and every ornamental feature in a finished product, regardless of their relationship to the novelty in the claimed design. If claimed in the same design patent, such a strategy would often unduly limit the design scope by the claimed inclusion of tangential, functional, or incidental features which, while not themselves adding to the novelty of the design, are included simply with the intent of covering more "surface area" of the final product and thus a higher percentage of the infringer's profits. If

claimed in multiple design patents, such a strategy would increase the overall cost of obtaining and enforcing design patent coverage for a given product.

This outcome is reminiscent of the former strategy used by many design applicants prior to this Court's *en banc* ruling in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 677 (Fed. Cir. 2008): filing multiple design patents for the same product, with each design patent claiming a different sub-combination of the "points of novelty" of the product's design, even if a fewer number of filings would have sufficed if the focus were (properly) on the "design as a whole." If the interpretation of Section 289 by Appellants and their supporting *amici* were to be adopted, one could envision a new strategy for filing multiple design patents for the same product, with each design patent claiming a different "point of profit" perceived in the product's design. These difficulties were precisely what Congress intended to eliminate with the Section 289 language "to the extent of his total profit." Recovery of an infringer's profits on only a specific portion of a product "to which such design or colorable imitation has been applied" is something less than the "total profit" required by the statute. A focus on specific elements of an infringer's product in this manner would thus make it practically impossible for a patentee to recover the infringer's total profits from the sale of an accused product.

## CONCLUSION

In many ways, the brand and success of Crocs is intertwined with its industrial designs—when people think of Crocs, they visualize its iconic shoe designs. An ability to recover a design patent infringer's total profit has been important to Crocs in its early design patent enforcement, and continues to drive the company's design innovation. Iconic designs like those of Crocs are expensive, difficult, and time-consuming to produce, but are cheap, easy, and fast to copy.

Any attempt to apportion design patent damages would be contrary to the plain language of Section 289, its legislative history, and subsequent jurisprudence. But changing the law regarding damages calculation under Section 289 would also make design patents less valuable, more difficult and expensive to obtain and enforce, and less deterring to would-be copyists, resulting in less investment in design work. This would hinder design innovation not only in the smartphone industry, but also in the numerous other industries whose products are intertwined and integrated with the patented designs applied to them, and that rely on the ability to obtain an infringer's total profits as a remedy.

For these reasons, Crocs respectfully urges affirmance of the award of damages for design patent infringement in this case.

- 22 -

Respectfully submitted,

/s/ Natalie Hanlon-Leh

August 4, 2014

Natalie Hanlon-Leh
Joel D. Sayres
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203
(303) 607-3500

*Counsel for Crocs, Inc.*

# CERTIFICATE OF COMPLIANCE

1.     This brief has been prepared using:

 X  Microsoft Word 2010 (Times New Roman, 14-point Typeface)

2.     EXCLUSIVE of the certificate of interest; table of contents; table of authorities; any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains 5,036 words and is within the 7,000 word limit pursuant to Federal Circuit Rule 29(d).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line printout.

Dated:  August 4, 2014          By: */s/ Natalie Hanlon-Leh*
                                         Natalie Hanlon-Leh
                                         *Counsel for Amici Curiae Crocs, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing *Amicus Curiae* Brief For Crocs, Inc.

In Support Of Plaintiff-Appellee Apple, Inc. with the Clerk of the United States Court

of Appeals for the Federal Circuit via the CM/ECF system and served a copy on

counsel of record, this 4th day of August, 2014, by the CM/ECF system.


Dated:  August 4, 2014                 By: */ Natalie Hanlon-Leh*
                                       Natalie Hanlon-Leh
                                       *Counsel for Amici Curiae Crocs, Inc.*